**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **iMORTGAGE SERVICES, LLC ,** ***Plaintiff*** | * | **CIVIL ACTION NO. 3:19-cv-00849** |
| | * | |
| **VERSUS** | * | **JUDGE: SHELLY D. DICK** |
| | * | |
| **LOUISIANA REAL ESTATE APPRAISERS BOARD, AND ROLAND M. HALL, GAYLE A. BOUDOUSQUIE, CHERYL B. BELLA, NEWTON J. LANDRY, TOMMIE E. MCMORRIS, SR., MICHAEL A. GRAHAM, CLAYTON F. LIPSCOMB, and TIMOTHY W. HAMMETT, in their official capacities as Members of the Louisiana Real Estate Appraisers Board,** ***Defendants*** | * * * * * * | **MAG. JUDGE: ERIN WILDER-DOOMES** |

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND DAMAGES AND ATTORNEY'S FEES**

NOW INTO COURT, through undersigned counsel, comes iMortgage Services, LLC ("Petitioner" or "iMortgage") who files its Complaint for Declaratory Judgment, Injunctive Relief and Damages and Attorney's Fees follows:

## INTRODUCTION

1. This is an action for violations of the federal antitrust laws, which prohibit pernicious agreements to restrain or monopolize trade. 15 U.S.C. §§ 1, 2, 15 and 26. The Louisiana Real Estate Appraisers Board and its active market participant members, have conspired and agreed to restrict trade and commerce in the real estate appraisal market in the State of Louisiana. Their actions to restrain trade

and further their conspiracy include demanding compliance by and enforcing against Appraisal Management Companies ("AMCs"), like iMortgage La. Admin. Code tit. 46, pt. LXVII, § 31101 (2013) ("Rule 31101") which was repealed and replaced with an identical rule La. Admin. Code tit. 46, pt. LXVII, § 31101 (2017) ("Replacement Rule 31101"). Significantly, the Federal Trade Commission (FTC) has determined that Rule 31101 and Replacement Rule 31101 unreasonably restrained price competition for appraisal services.[1]

2. The Louisiana Real Estate Appraisers Board and its members, eight out of ten of whom, at all times pertinent hereto, were active participants in the Louisiana single-family residential real estate appraisal market- the market for real estate appraisal services in Louisiana - have fixed the price for residential appraisal services above the price at which the free market would set prices for these services absent Defendants interference and price-fixing conspiracy.

3. The decisions, concerted actions, and policies by the Louisiana Real Estate Appraisers Board and its members in implementing and enforcing Rule 31101 and Replacement Rule 31101, which, serve to set artificially inflated prices for single-family residential real estate appraisals in the State of Louisiana, thus constituting anticompetitive conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. As set forth below, the members of the Louisiana Real Estate Appraisers Board, 8 out of a total of 10 of whom, at all times pertinent hereto, were licensed real estate appraisers, engaged in an illegal coordinated campaign to artificially fix higher prices for their own benefit and to the detriment of

[1] **Exhibit A-** 4.10.18 Opinion and Order of the FTC.

consumers and the relevant marketplace.

4. The single-family residential real estate appraisal market in Louisiana has suffered substantial injury from Defendants' pernicious price-fixing conspiracy, including those appraisers and appraisal companies that have been forced to inflate their price to the detriment of the consumer of appraisal services AMCs, like iMortgage, have been injured and unless the conduct is restrained, will continue to be injured in their business and property by the unlawful conduct by the Louisiana Real Estate Appraisers Board and its members.

5. To remedy these violations of antitrust law, iMortgage seeks: a declaration that Rule 31101 and Replacement Rule 31101 are unenforceable and were unenforceable when the Louisiana Real Estate Appraisers Board and its members took action against iMortgage and that said action was thus invalid; injunctive relief against the Louisiana Real Estate Appraisers Board and its members to prohibit any further application of Replacement Rule 31101 and/or effort to mandate the payment of higher than market average appraisal fees; and a judgment awarding compensatory and treble damages, attorneys' fees, costs and interest.

## PARTIES

6. Plaintiff, iMortgage Services, LLC, is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, authorized to do and doing business in the State of Louisiana.

7. Defendant, Louisiana Real Estate Appraisers Board, (the "Board"), body composed of ten members appointed by the Governor, with one member appointed from each congressional district and four members appointed at large,

created pursuant to La. R.S. 37:3394.

8. Defendant Roland M. Hall was the chair of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. R366), who, upon information and belief resides in Shreveport, Louisiana.

9. Defendant Gayle A. Boudousquie was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No.G125), who, upon information and belief, resides in New Orleans, Louisiana.

10. Defendant Cheryl B. Bella was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. R587), who, upon information and belief resides in Baton Rouge, Louisiana.

11. Defendant Newton J. "Butch" Landry was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. R587), who, upon information and belief resides in Pierre Part, Louisiana.

12. Defendant Tommie E. McMorris, Sr. was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. R37), who, upon information and belief resides in Albany, Louisiana.

13. Defendant Michael A. Graham was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. G938), who, upon information and belief resides in Monroe, Louisiana.

14. Defendant Clayton F. Lipscomb was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. G763), who, upon information and belief resides in Metairie, Louisiana.

15. Defendant Timothy W. Hammett was a member of the Board, at all times pertinent hereto, and is a licensed fee appraiser (License No. R1166), who, upon

information and belief resides in West Monroe, Louisiana.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17. This Court has personal jurisdiction over the Board and each individual Defendant because the Board is situated within the Middle District of Louisiana.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in Louisiana, all defendants reside in Louisiana, and several of the defendants reside in this district. Additionally, a substantial part, if not all, of the events or omissions giving rise to iMortgage's claim occurred in the Middle District of Louisiana.

## FACTUAL BACKGROUND

### *Dodd-Frank Appraisal Requirements*

19. Following the housing bubble and resultant financial crisis of 2008, residential real estate appraisal reform was one of the numerous changes implemented across the finance industry.

20. In 2009, the Home Valuation Code of Conduct ("HVCC") was implemented as a result of investigations by the New York State Attorney General's Office relative to home valuations, which were allegedly inordinately high.

21. The HVCC set forth certain requirements with regard to independence of fee appraisers. Specifically, the HVCC was designed to promote professional appraisals free from inappropriate pressure from lenders, borrowers, and brokers.

22. Subsequently, in 2010, Congress passed Section 1472 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") [2], which amended the Truth in Lending Act ("TILA")[3] to establish minimum requirements for providing appraisal management services. These rules were effective on December 7, 2010 and replaced the HVCC. More specifically, the Final Rule on Minimum Requirements for Appraisal Management Companies ("Final Rule") implements Section 129E of TILA, which is applicable to AMCs whenever they provide appraisal management services in certain home mortgage transactions.[4]

23. As part of both the HVCC and the new appraisal independence rules under TILA, fee appraisers are prohibited from having direct contact with loan company origination and production staff.

24. As a result of these restrictions on contact, many lenders began utilizing AMCs to provide a layer of independence in the appraisal ordering process.

25. AMCs, by acting as an intermediary, eliminate direct communications between lenders and appraisers, thereby providing assurance that there is no undue influence by lenders over appraisers, thus guarding against violations of applicable federal law.

26. Accordingly, many lenders exclusively deal with AMCs and do not directly communicate with or contract with individual appraisers and non-AMC appraiser entities.

---

[2] 12 U.S.C.A. § 5301.
[3] 12 C.F.R. § 226.
[4] 80 FR 32658-01.

27. The applicable federal regulations require that "[i]n any covered transaction, the creditor and its agents shall compensate a fee appraiser for performing appraisal services at a rate that is customary and reasonable for comparable appraisal services performed in the geographic market of the property being appraised."[5] A "covered transaction" is defined as "an extension of consumer credit that is or will be secured by the consumer's principal dwelling."[6]

28. Dodd-Frank also requires that states establish licensing criteria for AMCs, which meets the minimum standards set forth in Dodd-Frank and in applicable regulations, within 36 months of the effective date of the Final Rule, which had an effective date of August 10, 2015.

29. Prior to Dodd-Frank, the State of Louisiana did not regulate AMCs. Then, in 2010, in furtherance of the TILA and the Dodd-Frank Act, the Louisiana Legislature promulgated the Appraisal Management Company Licensing and Regulation Act (the "Act").[7]

30. The Act requires AMCs to become licensed and to comply with certain compliance criteria in order to engage in appraisal management services in Louisiana.

31. LREAB subsequently promulgated rules and regulations pertaining to the licensing and regulation of appraisal management companies in accordance with La. R.S. 37:3395 and 3415.21, which became effective in November, 2013.[8]

---

[5] 12 C.F.R. § 1026.42(f).
[6] *Id.*
[7] *See* La. R.S. 37:3415.15(A).
[8] *See* 46 LAC Pt LXVII, § 30101 (2013).

32. As noted above the LREAB had not regulated AMCs prior to the Act, yet, following the enactment of the Louisiana Real Estate Appraisers Law and Rules, the Board issued no guidance or pronouncements on the subject of compliance with the Act or the Board's Rules.

***The Relevant Market***

33. The relevant market for purposes of analyzing the Board's conduct consists of real estate appraisal services sold to AMCs in Louisiana. These services consist of single-family residential appraisals in Louisiana that are considered covered transactions under .12 C.F.R. § 1026.42(f).

34. At all times pertinent hereto, iMortgage operated in 38 states, including Louisiana where it was first licensed in January 1, 2011, and remained in good standing.

35. Between November, 2013, and present AMCs and appraisers acting on their behalf performed thousands of appraisals, including 2,528 residential real estate appraisal assignments in Louisiana completed through iMortgage.

36. Upon information and belief, there are currently approximately 113 licensed AMCs in the State of Louisiana.

37. Because of the implementation of new federal appraisal independence rules, AMCs have become more prevalent in the appraisal industry are providing thousands of appraisals annually in the Louisiana single-family residential appraisal marketplace, competing directly against independent fee appraiser business entities.

38. Because of the increased competition, the market for the provision of appraisal services has become more competitive as a whole, and price competition has increased in the relevant product market.

39. The Board, purportedly under the auspices of Louisiana law, has and exercises the de facto power to exclude fee appraisers, fee appraiser business entities, and AMCs from competing in the relevant market.

***Anticompetitive Structure of the Board***

40. Pursuant to La. R.S. 37:3394, the Board must be composed of ten members appointed by the Governor, with one member appointed from each congressional district and four members appointed at large.

41. Under La. R.S. 37:3394(B)(2), of these ten members, four are required to be general appraisers and at least two of the ten members must be residential appraisers; one member is required to be an employee or representative of a licensed AMC; and two members are required to be from the real estate lending arena.

42. Notably, the one spot reserved for AMC employees/representatives is narrowly-tailored, and includes a requirement that any such person be "a citizen and qualified elector of Louisiana" and "licensed as a Louisiana certified real estate appraiser immediately preceding the appointment to the board."

43. Thus, only Louisiana citizens who are also Louisiana certified real estate appraisers are eligible for appointment to the Board as the purported AMC representative.

44. Upon information and belief, at all times pertinent hereto, Defendant, Timothy W. Hammett, was the purported AMC representative on the Board.

45. Upon information and belief, Defendant, Timothy W. Hammett's business was primarily engaged in real estate appraisals and not AMC services.

46. Accordingly, at all times pertinent hereto, 8 of the 10 members of the Board were licensed appraisers and active market participants; double the number required under La. R.S. 37:3394(B)(2) for a total of 80% of the Board membership which was comprised of licensed appraisers and active market participants.

47. Because the licensed appraiser membership of the Board represents a super-majority of the Board, all decisions made by the Board are driven by fee appraiser interests, which, as discussed further below, can be directly counter to the interests of AMCs.

48. None of the Board members sits on the Board as a government employee.

49. Final decision-making authority on all AMC licensure issues lies with the Board.

50. At all times pertinent hereto, no employee or officer of the State of Louisiana possessed authority to veto or modify particular decisions of the Board to ensure they accord with state policy. Stated otherwise, at all times pertinent hereto, the Board's actions were not subject to review by governmental authority.

51. Moreover, in the words of appraiser organizations, including the Louisiana Real Estate Appraisers Coalition "it is no secret that relations between appraisers and AMC's are often strained."[9]

52. The first among a list of complaints by the appraiser organizations was the organizations' belief that AMCs "make assignments on the basis of strictly the lowest fee, without regard to competence in valuing that particular property…"[10]

---

[9] *See, e.g.,* Exhibit B- Appraiser Organizations 11.9.2015 Ltr. to Mortgage Bankers Association.
[10] *Id.*

53. The appraiser organizations recommended that lenders "who do utilize AMC's scrutinize the procedures and policies of those entities to ensure that they are contributing to the product that is wanted and at a price that reflects their worth to the lender."[11]

54. The appraiser organizations have further alleged that there was not a shortage of appraisers, but rather that "a growing number are refusing to work for fees that are not commensurate with the expertise, time, and expense required to complete an assignment, as well as the liability exposure, of mortgage work, especially when the assignments come through AMC's." *Id.*

55. Defendant, Roland Hall, was a founding board member of the Louisiana Real Estate Appraiser Coalition, which expressed the distrust of AMCs set forth in the preceding paragraphs.

56. Because the Board is controlled by active market participants who are direct competitors of AMCs, and who possess strong self-interest, the Board's structure poses inherent risk of self-dealing and anti-competitive conduct in the relevant market.

57. Because of the Board's anti-competitive structure dominated by market participants, the Board does not possess state action immunity under the federal antitrust laws. See *North Carolina State Board of Dental Examiners v. Federal Trade Comm'n,* 135 S. Ct. 1101 (2015).

[11] *Id.*

***The Board's Anticompetitive Rules***

58. In November, 2013, the Board promulgated rules regulating AMCs for the stated purpose of "establish[ing] compliance procedures whereby appraisal management company licensees can meet the amended licensing requirements enacted in Act 429 of the 2012 Regular Session consistent with the requirements of the federal Dodd-Frank Wall Street Reform and Consumer Protection Act; (2) establish[ing] grievance or complaint procedures; and (3) further clarify[ing] investigative procedures.

59. Chapter 311 of the November, 2013 regulations promulgated by the Board was entitled "Compensation of Fee Appraisers" and included Rule 31101 "General Provisions; Customary and Reasonable Fess; Presumptions of Compliance."[12]

60. Under Rule 31101, AMC's were required to compensate appraisers at a rate "that is customary and reasonable for appraisal services performed."

61. AMCs could establish that fees paid were customary and reasonable by one of three methods: (1) through objective third-party information such as government agency fee schedules, academic studies, and independent private sector surveys (excluding assignments ordered by AMCs); (2) through a fee schedule that may be established by the Board; or (3) on another basis provided that this basis comports with the six review factors set forth in §31101(B)(1-6) for determining whether a fee is customary and reasonable.

[12] As set forth more fully below, and upon repeal of Rule 31101, the Board then promulgated Replacement Rule 31101, which is nearly identical to former Rule 31101, yet giving rise to the same anticompetitive effect and result. The only difference between Rule 31101 and Replacement Rule 31101, is the Board's attempt to save the rule by claiming governmental supervision to come under the umbrella of Parker immunity. An effort that the FTC has since rejected and noted that the Replacement Rule is unenforceable under the federal antitrust laws.

62. At all times pertinent hereto, the Board maintained the position that it had not adopted a fee study as it was able to do under Rule 31101(A)(2), but it did commission a fee study conducted by the Southeastern Louisiana University Business Research Center (the "SLU Fee Study").

63. At all times pertinent hereto, the Board provided AMCs with notice of the SLU Fee Study and posted the SLU Fee Study on its website.

64. The Board has effectively required AMCs to pay appraisal fees that equal or exceed the median fees identified in the SLU Fee Study.

65. As set forth more fully below, after an FTC action alleging that it violated antitrust laws in connection with the implementation and enforcement of Rule 31101, repealed Rule 31101 and adopted the Replacement Rule 31101, which is substantially the same as Rule 31101.

***<u>The Board's Anticompetitive Enforcement Action against iMortgage</u>***

66. The Board's anticompetitive enforcement action which resulted in the anticompetitive actions that give rise to this lawsuit commenced when the Board received a complaint in May 2014 from an appraiser alleging that iMortgage was in violation of the Louisiana Real Estate Appraisers Law and Rules (the "Complaint").

67. Specifically, the Complaint indicated that iMortgage had offered a fee to an appraiser that was not in compliance with the Louisiana Real Estate Appraisers Law and Rules.

68. Notably, absent from the Complaint was any allegation of harm or even the threat of harm to members of the public, borrowers or lenders based on iMortgage's actions that formed the substance of the Complaint.

69. Moreover, the transaction that formed the basis for the Complaint fell outside the ambit of the federal and state laws relative to customary and reasonable compensation and, as such, was not within the jurisdiction of the LREAB.

70. Nonetheless, based solely on the allegations in the Complaint, the Board opened an investigation of iMortgage in June 2014.

71. iMortgage received notice of the Board's investigation by correspondence dated July 1, 2014 (the "Allegation Letter").

72. The Allegation Letter contained no details of the allegations made against iMortgage and as such provided no information or other details to apprise iMortgage of the scope of LREAB's investigation.

73. The Allegation Letter requested a broad list of documents relating to iMortgage's activities in Louisiana for a period beginning December 1, 2013 through July 1, 2014.

74. In the spirit of full compliance, iMortgage submitted all requested documentation for the seven (7) month investigative period to the Board on July 28, 2014.

75. The documentation submitted showed that iMortgage completed approximately one hundred and fifty (150) appraisal transactions of various types, including review, default and origination appraisal products, between the dates of December 1, 2013 and July 1, 2014.

76. Included in the materials provided by iMortgage was ample information to allow LREAB to determine that the vast majority of these appraisal transactions were not "covered transactions" subject to the jurisdiction of TILA, the Dodd-Frank Act and Louisiana Real Estate Appraisers Law and Rules and as such no action should have commenced.

77. Following this initial submission, no one from LREAB contacted iMortgage to request any additional information or clarification regarding any of the transactions disclosed to LREAB by iMortgage.

78. On November 21, 2014, iMortgage received what was styled a Preliminary Notice of Adjudication from the Board indicating that a formal adjudicatory hearing would take place to address the charges alleged in the Complaint.

79. This Preliminary Notice of Adjudication did not set forth any specific charges, and was thus insufficient to provide iMortgage with sufficient notice of the charges that the Board intended to bring against it, in violation of the Due Process guarantees under the United States and Louisiana Constitutions.

80. In a June 24, 2015 second Preliminary Notice of Adjudication and a formal complaint, for the first time, LREAB provided iMortgage with notice of the allegations against it where the Board cited iMortgage for one hundred and fifty (150) violations, alleging that "iMortgage failed to use established fees set by an objective third party or to use the factors set forth in Rule 31101, in violation of LSA-R.S. 37:3415.19(1) and (2), LSA-R.S. 37:3415.15 and Rule 31101 of the Rules and Regulations of the Louisiana Real Estate Appraisers Board."

81. On September 16, 2015, iMortgage received a third Preliminary Notice of Adjudication and formal complaint from the Board, wherein the Board removed the five violations alleging untimely payment. This third Preliminary Notice of Adjudication maintained the one hundred and fifty (150) appraisal transactions cited in the second Preliminary Notice of Adjudication.

82. iMortgage re-submitted evidence that it had previously provided to the Board in its July 28, 2014 response to the Allegation Letter, packaged in a way that aided

the Board in understanding that the majority of the one hundred and fifty (150) appraisal transactions at issue were not subject to TILA, Dodd-Frank, and the Louisiana Real Estate Appraisers Law and Rules, and as such, were beyond the scope of the Board's investigation and could not form the basis for any lawful charges.

83. On November 17, 2015, iMortgage received a fourth Preliminary Notice of Adjudication and formal complaint from LREAB in which the Board struck one hundred and thirty five (135) of the one hundred and fifty (150) alleged violations, or all but fifteen (15) of the one hundred and fifty (150) alleged violations.

84. Subsequent to receipt of this fourth Preliminary Notice of Adjudication, iMortgage again provided evidence to assist the Board; these materials illustrated that only nine (9) of the remaining fifteen (15) appraisal transactions at issue were arguably under the purview of the laws and rules enforced by the Board.

***<u>The Adjudicatory Hearing & Penalties</u>***

85. LREAB scheduled a formal adjudicatory hearing for December 8, 2015 (the "December Hearing").

86. iMortgage incurred considerable expenses in attorney's fees, expert witness fees, and costs in order to prepare for the December Hearing.

87. At the December Hearing, iMortgage incurred further attorney's fees, expert witness fees, and costs in a proceeding which lasted over twelve (12) hours.

88. Over the course of the December Hearing, iMortgage showed through the testimony of the Board's own employees, that the investigation of the alleged violations by iMortgage was flawed from the outset, since, by their own admission, LREAB investigators: (i) are not familiar with the TILA and the Dodd-Frank Act;

(ii) failed to complete their investigation within the timeframe set forth in the Board's internal guidelines; and (iii) failed to track the activities performed by the investigators.

89. Additionally, it was established that despite the fact that other methods for establishing customary and reasonable fees were set forth in Rule 31101 and that the Board did not explicitly mandate use of the SLU Fee Study, this fee study and perhaps one other fee study issued by the Department of Veteran's Affairs (VA) were the only means that the Board's investigator and director of investigations were aware of that had been the accepted as evidence of customary and reasonable fees under Rule 31101.

90. It was also established that the investigator in the enforcement action against iMortgage did not request or obtain a copy of the independent fee study that iMortgage advised the investigator that it relied on in establishing the appraisal fees that formed the basis for the Board's enforcement action.

91. The December Hearing, which was conducted before the Board and the Defendant members, provided only the facade of due process, a fact that was underscored when, at the close of the Board's case-in-chief and *before iMortgage presented any evidence*, Board member Tommie McMorris, Sr., an active market participant, ostensibly reading from a prepared statement, made a motion to "find the respondent, iMortgage, guilty of the charges set forth in the written complaint."

92. In its case-in-chief, iMortgage presented expert testimony by William Wade Matchneer, III, an attorney who previously worked as Senior Counsel for the United States Consumer Financial Protection Bureau (CFPB), and in that capacity was responsible for issues in several areas of federal consumer financial law,

including, but not limited to the TILA.

93. Mr. Matchneer provided testimony relative to the interaction between federal law and State regulations, opining that the State regulations could not exceed the restrictions set forth under applicable federal law.

94. iMortgage also presented the testimony of Dean Kelker, a Senior Vice President and chief risk officer with iMortgage.

95. In his testimony, Mr. Kelker walked through how iMortgage complied with the requirement that it pay customary and reasonable appraisal fees.

96. Mr. Kelker testified that for certain of the covered transactions at issue iMortgage utilized a fee study by one of its clients, Flagstar Bank.

97. Mr. Kelker further testified that in addition to the Flagstar fee study, iMortgage ensured that the appraisal fees it paid were compliant with the six factors set forth in Rule 31101(B).

98. At the close of the December Hearing, after going into executive session (despite the absence of grounds for so doing) so that it could deliberate outside of the public eye, the Board, by way of a unanimous roll-call vote, approved a decision finding that iMortgage was in violation of the Louisiana Real Estate Appraisers Law and Rules.

99. Additionally, the Board, also by unanimous roll-call vote, approved a motion directing that iMortgage pay a monetary penalty and be cast with the costs of the adjudication, and be subject to a six month suspension that was stayed to March 21, 2016 subject to iMortgage's compliance of the customary and reasonable fee plan approved by the Board.

100. The Board subsequently issued a brief three-page document purporting to be their Findings of Fact, Conclusions of Law, and an Order ("Order") dated December 14, 2015.

101. The Order directed that:

a. iMortgage be censured for the violations committed;

b. iMortgage pay a fine in the amount of $10,000.00 and the administrative costs of the adjudicatory proceeding; and that

c. iMortgage's license be suspended for a period of six (6) months with a stay of enforcement to be placed on such suspension pending iMortgage providing the Board with a compliance plan to be reviewed and approved by the Board.

102. The Order appeared in trade publications beyond Louisiana, in other markets in which iMortgage operates, and, upon information and belief was seen by some of iMortgage's customers.

103. Since the publication of this Order and articles detailing the same, iMortgage has experienced a loss of customers who had ordered appraisals from iMortgage in 2015 but ceased ordering from iMortgage following the dissemination of this information.

***Anticompetitive Actions Following December Hearing***

104. Subsequently, on December 28 2015, iMortgage filed a timely Request for Rehearing of the Findings pursuant to La. R.S. 49:959.

105. Then, on February 4, 2016, inexplicably and without providing any notice to iMortgage, the Board at an irregularly scheduled Board meeting, conducted a

"hearing" on iMortgage's Request for Rehearing and summarily denied the same.

106. On February 19, 2016, iMortgage filed a Request for Reconsideration of the Board's Decision to deny its Request for Rehearing.

107. On February 26, 2016, iMortgage submitted a compliance plan in accordance with the Order. This compliance plan more than adequately established a proposal to comply with all applicable laws and regulations with respect to any covered transactions.

108. Nonetheless, the Board summarily rejected iMortgage's compliance plan on March 10, 2016. In its rejection, the Board repeated and relied upon its erroneous findings from the December 2015 Hearing.

109. On March 15, 2016, after the Board's denial of its initial compliance plan, iMortgage submitted a revised compliance plan to the Board utilizing the most recent version of the SLU Fee Study which the Board Staff asserts is an "approved fee study".

110. iMortgage presented the revised compliance plan using the SLU Fee Study solely to preserve its ability to conduct appraisal business in Louisiana.

111. iMortgage has, at all times pertinent hereto, viewed the SLU Fee Study as fundamentally flawed based on the fact that the SLU Fee Study data is self-reported, subjective, and for an unknown scope of work. iMortgage experienced firsthand that the fees under the SLU Fee Study are often higher than fees that were being paid and accepted in the single-family residential real estate market in Louisiana.

112. The Board, in its March 21, 2016 meeting approved the revised compliance plan wherein iMortgage proposed, under duress, the use of the SLU Fee Study.

113. This approval of the compliance plan utilizing the SLU Fee Study was consistent with the Board's efforts to have the SLU Fee study serve as a floor for appraisal fees in the single-family residential appraisal market in Louisiana. This price-fixing is underscored by the fact that the Board, on multiple occasions, including but not limited to the case of iMortgage and Coester VMS, conditioned the resolution of enforcement action vis-à-vis AMCs upon an AMC's agreement to pay appraisal fees at or above the SLU Fee Study.

114. From the adoption of the revised compliance plan to October, 2017, thousands of appraisals were ordered by AMCs, including but not limited to iMortgage, which ordered numerous appraisals on covered transactions and paid inflated appraisal fees commensurate with the SLU Fee Study on these appraisals solely due to the Board's anticompetitive conduct.

115. In the case of, iMortgage estimates that between March, 2016 and October, 2017, it paid approximately $22,000.00 more in appraisal fees by using the SLU Fee Study as compared to appraisal fees established by a bona fide negotiation.

116. As a result, AMCs, their customers and ultimately the consumers of the appraisal services have been damaged by being forced to pay a premium above the market rate for appraisal fees in the relevant market area due solely to the mandate by the Board that AMCs like abide by the SLU Fee Study or risk enforcement action which could potentially result in license suspension or revocation.

***<u>FTC Complaint and Action</u>***

117. On May 30, 2017, the Federal Trade Commission (FTC) instituted a civil administrative action to prevent, restrain, or punish the Board's violations of

antitrust laws when it filed an administrative complaint against the Board, alleging that the Board is unreasonably restraining price competition for appraisal services in Louisiana, contrary to federal antitrust law (the "FTC Complaint").[13]

118. The FTC Complaint alleges that "in both promulgating and subsequently enforcing that regulation, the Board has unlawfully restrained price competition."[14]

119. The FTC Complaint further asserts that "by its express terms, the Board's fee regulation unreasonably restrains competition by displacing a marketplace determination of appraisal fees."[15]

120. The FTC Complaint asserted that Board required AMCs to pay appraisal fees equal to or in excess of median fees identified in the SLU Fee Study.[16]

121. The FTC noted that the Board took enforcement actions against iMortgage, as well as another AMC, Coester VMS, that ultimately resulted in each AMC submitting to demands that they pay appraisal fees according to the SLU Fee Study.[17]

122. The Board's actions were publicized in trade publications, with reports that Board's enforcement against Coester VMS of the customary and reasonable fee requirement "made history."[18]

---

[13] **Exhibit C- FTC Complaint.** Pursuant to 15 U.S.C.A § 16(i), the limitations period for private antitrust actions shall be suspended during the pendency thereof and for one year thereafter. See also, *In re: Evanston Nw. Healthcare Corp. Antitrust Litig*., No. 07 C 04446, 2016 WL 4720014, at *6 (N.D. Ill. Sept. 9, 2016); *Lippa's, Inc. v. Lenox, Inc.,* D.C.Vt.1969, 305 F.Supp. 182.

[14] *Id.* at ¶2.

[15] FTC Complaint at ¶3.

[16] FTC Complaint at ¶5.

[17] Exh. C. at ¶37, ¶40.

[18] *Id.* at ¶38.

123. Similarly, the Board's actions against iMortgage were likewise closely followed in the industry and reported in trade publications.[19]

124. The FTC Complaint noted that "other AMCs that learned of the Board's enforcement actions, in order to avoid disciplinary action, now use the SLU [Fee Study] to determine the fees that they pay appraisers."[20]

125. The FTC Complaint alleges that the "Board views the SLU Center survey results as setting a floor for appraisal fees that AMCs must pay appraisers."[21]

126. As the FTC asserted that this "conduct of the Board constitutes concerted action among the Board and its members."[22]

127. Moreover, as the FTC noted the Board's actions have unreasonably restrained competition and harmed consumers where the Board's actions tend to restrain significantly appraisal fee negotiations between appraisers and AMCs, and to raise prices paid by AMCs for appraisal services in Louisiana above competitive levels.[23]

128. Additionally, the FTC Complaint noted that "a controlling number of Board members are active market participants."[24]

129. Moreover, the Board's actions have not been supervised by independent state officials, that is, by persons who are not participants in the Louisiana appraisal industry.[25]

---

[19] *Id.* at ¶41.
[20] *Id.* at ¶6.
[21] *Id.* at ¶36.
[22] *Id.* at ¶55.
[23] *Id.* at ¶44.
[24] Exh. C at ¶53.
[25] *Id.*

130. The FTC further asserted that there had been a lack of supervision by independent state officials vis-à-vis the Board's actions, and that, as such, the Board was without any legitimate justification or defense for its anticompetitive acts.[26]

131. In an April 10, 2018 ruling on, *inter alia*, the FTC's motion for partial summary judgment regarding two of the Board's defenses, the FTC found that there was "no genuine dispute of fact either that the Board is subject to the active supervision requirement or that the Board's conduct prior to 2017 was not actively supervised."[27]

***<u>Judicial Review and Subsequent Actions</u>***

132. iMortgage filed a timely Petition for Judicial Review on March 14, 2016, seeking review of the December 15, 2015 Order sanctioning iMortgage.

133. Subsequently, on July 11, 2017, the Governor issued an Executive Order (JBE 17-16) directing changes both in the way the Board promulgates rules relating to the customary and reasonable fee requirement and in the way it enforces those rules (the "Executive Order").

134. On July 31, 2017, in light of the Executive Order, the Board voted to repeal Rule 31101 and adopt the Replacement Rule 31101 with precisely the same language as the previous rule.

---

[26] *Id.* at ¶7.

[27] Exhibit A- FTC 4.10.18 Order. On April 11, 2019, the Board filed a Complaint for Violations of the Administrative Procedure Act and for Declaratory Relief with this Court, seeking to set aside the Commission's April 10, 2018 Order. The Board moved the court to stay the administrative proceedings. On July 29, 2019, this Court granted the Board's motion and stayed this administrative proceeding until further order of this court. On August 5, 2019, the FTC issued a stay of the Administrative Proceedings consistent with this Court's ruling.

135. Following the issuance of the Executive Order, the Board closed all pending investigations under the original Rule 31101, and indicated that all enforcement actions based on the Rule prior to its reissuance either expired by their own terms or were vacated or terminated with no finding of violation, and that any prior payments or enforcement actions will not be admissible in future proceedings.

136. The Board indicated that all future enforcement actions are to be based on Replacement Rule 31101 (which, is identical to the original Rule 31101) and would be subject to the review procedures set forth in the executive order and a memorandum of understanding entered into by the Board and the DAL.

137. In its aforementioned April 10, 2018 Order, the FTC found the newly added oversight of the Board's enforcement actions left "significant coverage gaps" and that "draw the sufficiency of supervision of enforcement proceedings into question and highlight the fact that an absence of supervision of the reissuance of Rule 31101 means that significant aspects of the Board's activities receive no supervision whatsoever."[28]

## CAUSES OF ACTION

## COUNT ONE

## (Agreement in Violation of the Sherman Act, 15 U.S.C. § 1)

138. Plaintiff incorporates by reference paragraphs 1 through 138 of this Complaint as though fully set forth herein.

139. The Board and the individual named Defendants agreed to prevent iMortgage from establishing appraisal fees at any other level than the fixed by the Board at

[28] **Exhibit A- at p. 15.**

the inflated level set forth in the SLU Fee Study.

140. In so doing, the Board has prevented AMCs and appraisers from arriving at appraisal fees through bona fide negotiation and through the operation of the free market.

141. Instead, the Board has unlawfully fixed prices and restrained price competition, effectively requiring AMCs to match or exceed appraisal rates listed in the SLU Fee Study.

142. Because the Board is comprised of active market participants operating in the same market as iMortgage, their price fixing conspiracy and anticompetitive conduct is an unreasonable restraint of trade, which has and will continue to drive up the cost of residential appraisals and necessarily affect interstate commerce.

143. Defendants' conduct is unlawful price fixing, a per se violation of Section One of the Sherman Act. 15 U.S.C. § 1.

**COUNT TWO**

**(Conspiracy in Violation of the Sherman Act, 15 U.S.C. § 1)**

144. Plaintiff incorporates by reference paragraphs 1 through 138 of this Complaint as though fully set forth herein.

145. The Board and the individual named Defendants have conspired to prevent iMortgage from negotiating customary and reasonable appraisal fees.

146. Because the Board is comprised of active market participants, their anticompetitive conduct is an unreasonable restraint of trade, which has and will necessarily drive up the cost of residential appraisals and necessarily affect interstate commerce.

147. Defendants' conduct amounts to price fixing, a per se violation of Section 1 of the Sherman Act.

**COUNT THREE**

**(Conspiracy in Violation of the Sherman Act, 15 U.S.C. § 2)**

148. Plaintiff incorporates paragraphs 1 through 138 of this Complaint as if fully set forth herein.

149. The Board possesses monopoly power in the relevant market by virtue of its regulatory position.

150. The Board and the Defendant members conspired to abuse that monopoly position by purposefully enforcing its rules to require payment of appraisal fees subject to a fee study that consistently set fees higher than the market rate in the areas.

151. By denying iMortgage's ability to establish appraisal fees through bona fide negotiation and the operation of the free market the Board and the active market participant Defendant members are removing competition from the AMC market by imposing a fixed rate structure above what appraisers had been accepting prior to the Board's anticompetitive actions.

152. Defendants' conduct represents a violation of Section 2 of the Sherman Act.

**DAMAGES**

153. Defendants' actions have unreasonably restrained competition and harmed consumers where the Board's actions restrain significantly appraisal fee negotiations between appraisers and AMCs, and raise prices paid by AMCs for appraisal services in Louisiana above competitive levels.

154. In order to avoid further enforcement action by the Board, AMCs such as iMortgage and Coester VMS have paid appraisal fees in line with the SLU Fee Study thereby negating the ability to engage in bona fide negotiations with appraisers for appraisal fees.

155. Likewise, the Board's enforcement actions against AMCs like iMortgage and Coester VMS, and the widespread publicity of the same, have produced a chilling effect on competition in the appraisal market for AMCs with other AMCs, upon information and belief, opting to pay the SLU Fee Study appraisal rates to avoid retribution.

156. iMortgage, and upon information and belief, other AMCs that were subjected to the Board's anticompetitive enforcement actions and have experienced damages in the form of lost revenue and lost opportunity where former customers ceased ordering appraisals from iMortgage as a result of the publication of the Order and articles related to same.

157. Additionally, iMortgage incurred attorney's fees and costs in connection with the enforcement action and December Hearing which were solely attributable to the anticompetitive interpretation and enforcement of Rule 31101.

158. Following the Order, iMortgage incurred additional attorney's fees and costs in connection with the judicial review of the Order.

159. iMortgage incurred attorney's fees and costs in connection with the enforcement action and December Hearing which were solely attributable to the anticompetitive interpretation and enforcement of Rule 31101.

## JURY DEMAND

160. Plaintiff demands a trial by jury on all issues triable by a jury.

## PRAYER FOR RELIEF

1. That the Court declare, adjudge, and decree that Defendants entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade and engaged in a price fixing conspiracy, a per se violation of Section One of the Sherman Act, 15 U.S.C. § 1;
2. As authorized by Section 16 of the Clayton Act, 15 U.S.C. § 26, that the Defendants be permanently enjoined and restrained from continuing, maintaining, or renewing the conduct alleged herein, having a purpose to violate federal antitrust laws and specifically for a permanent injunction against the Board prohibiting it from taking any action  to enforcement Replacement Rule 31101 against any AMC including iMortgage and prohibiting the Board and the individual defendants from entering into, attempting to enter into, adhering to, participating in, maintaining, organizing, implementing, encouraging, inviting, enforcing, offering or soliciting any agreement whether express or implied, to insulate themselves from competition from AMCs in the relevant market;
3. That the Court enter an order enjoining and foreclosing all efforts by Defendants to force AMCs in the relevant market, including but not limited to iMortgage to pay appraisal fees that are fixed and that violate free market principals;
4. That iMortgage be awarded threefold the monetary damages sustained as a result of the anticompetitive actions by Defendants, including but not limited to:[29]
   a. attorney's fees and costs incurred in connection with the wrongful enforcement action and subsequent judicial review action;
   b. amount of increased fees paid utilizing the SLU Fee Study; and
   c. reputational damage and lost business opportunity due to the December 15, 2015 Order and subsequent dissemination of same to trade publications;

[29] 15 USC § 15(a).

5. That iMortgage recover the costs of this lawsuit, including attorney's fees, and for all other relief this Court deems just and proper.

Respectfully submitted,

**ADAMS AND REESE LLP**

*/s/ Kellen J. Mathews*

Robert L. Rieger, Jr., (#18404)
Kellen J. Mathews (#31860)
Justin A. Jack (#36508)
450 Laurel Street, Suite 1900
Baton Rouge, Louisiana 70801
Telephone: (225) 336-5200
Facsimile: (225) 336-5220
robert.rieger@arlaw.com
kellen.mathews@arlaw.com
justin.jack@arlaw.com

and

Mark R. Beebe, T.A. (#19478)
4500 One Shell Square
701 Poydras Street
New Orleans, LA 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210 fax
mark.beebe@arlaw.com

***ATTORNEYS FOR PLAINTIFF IMORTGAGE SERVICES, LLC***