UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      Maureen K. Ohlhausen, Acting Chairman
                    Terrell McSweeny

| | |
|---|---|
| In the Matter of<br><br>**Louisiana Real Estate Appraisers Board,**<br>**Respondent** | DOCKET NO. 9374 |

# COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, as amended, 15 U.S.C. § 41, *et seq.*, and by virtue of the authority vested in it by said Act, the Federal Trade Commission (the "Commission"), having reason to believe that the Louisiana Real Estate Appraisers Board has violated Section 5 of the Act, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues this complaint stating its charges as follows:

## NATURE OF THE CASE

1. The Louisiana Real Estate Appraisers Board (the "Board"), a state agency controlled by licensed real estate appraisers, has unreasonably restrained price competition for real estate appraisal services provided to appraisal management companies ("AMCs") in Louisiana. AMCs act as agents for lenders in arranging for real estate appraisals.

2. The Board adopted a regulation, effective as of November 20, 2013, purportedly implementing a requirement under federal and Louisiana law that AMCs pay appraisers a "customary and reasonable" fee for real estate appraisal services. In both promulgating and subsequently enforcing that regulation, the Board has unlawfully restrained price competition.

3. First, by its express terms, the Board's fee regulation unreasonably restrains competition by displacing a marketplace determination of appraisal fees. Under the regulation, AMCs must compensate appraisers at a rate determined by one of three methods: (1) an AMC may use a survey of fees recently paid by lenders in the relevant geographic area; (2) an AMC may use a fee schedule established by the Board; or (3) an AMC may identify recently paid fees and adjust this base rate using six specified factors. By requiring one of these three methods, the Board prevents AMCs and appraisers from arriving at appraisal fees through bona fide negotiation and through the operation of the free market.

1

4. Second, in subsequently enforcing its regulation, the Board has unlawfully restrained price competition, effectively requiring AMCs to match or exceed appraisal rates listed in a published survey. To that end, the Board commissioned the Southeastern Louisiana University Business Research Center ("SLU Center") to survey recent fees paid by lenders. The SLU Center conducted three annual surveys, in 2013, 2014, and 2015, and produced three reports on fees paid in 2012, 2013, and 2014, respectively. According to the Board, the SLU Center reports identify the median fees paid by lenders for five types of appraisals in nine geographic regions in Louisiana, stated separately for urban, suburban and rural settings. The Board provided AMCs with notice of the SLU Center reports and posted the reports on its website.

5. The Board has effectively required AMCs to pay appraisal fees that equal or exceed the median fees identified in the SLU Center reports. For example, the Board initiated two enforcement actions against AMCs for allegedly violating fee requirements under the Board's regulation. In each case, the Board resolved the enforcement action by securing the AMC's agreement to pay appraisal fees at or above the level set forth in the SLU Center reports. Other AMCs that learned of the Board's enforcement actions, in order to avoid disciplinary action, now use the SLU Center reports to determine the fees that they pay appraisers.

6. Through the promulgation of its regulation and through its investigative and enforcement actions, the Board—controlled at all relevant times by active market participants—has harmed competition through its regulation of fees paid by AMCs for appraisal services.

7. Independent state officials have not supervised the Board's discretionary actions. The actions of the Board restrict price competition among appraisers without any legitimate justification or defense, including the "state action" defense, and therefore violate Section 5 of the Federal Trade Commission Act.

**RESPONDENT**

8. The Louisiana Real Estate Appraisers Board is organized, exists, and transacts business under and by virtue of the laws of the State of Louisiana, with its principal office and place of business located at 9071 Interline Avenue, Baton Rouge, Louisiana 70809. The Board regulates and licenses both appraisers and AMCs.

9. AMCs are independent companies engaged by lenders to procure real estate appraisals. AMCs generally may not operate in Louisiana without first obtaining a license from the Board. The Board is empowered to discipline an AMC that violates any applicable Louisiana statute or regulation, including by revoking or suspending an AMC's license and imposing fines or civil penalties.

10. By statute, the Board consists of eight licensed appraisers and two representatives of the lending industry. One of the eight appraiser members must also be engaged in the business of appraisal management. The Governor of Louisiana appoints each Board member for a three-year term.

11. Collectively, the appraiser members control the operation of the Board. Appraiser members are active market participants because, among other things, appraiser members are licensed by the Board and have private interests in the Board's acts and practices.

## JURISDICTION

12. The Board is a "person" within the meaning of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.

13. The acts and practices of the Board, including the acts and practices alleged herein, are in commerce or affect commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 44. Appraisers offering appraisal services in Louisiana contract with AMCs based outside of Louisiana, including for the transfer of money across state lines. In addition, AMCs that contract for appraisal services in Louisiana act as agents for lenders based outside of Louisiana.

## THE PROVISION OF APPRAISAL SERVICES THROUGH APPRAISAL MANAGEMENT COMPANIES

14. Most residential real estate purchases are financed by a mortgage on the real estate that is the subject of the transaction. In most cases, a residential mortgage requires an appraisal of the real estate used as collateral for the loan, performed by an appraiser licensed under state law.

15. Institutions that lend money for residential real estate transactions engage appraisers directly or through an agent, including an AMC. An AMC typically maintains a "panel" of licensed appraisers in each locality in which it does business, negotiates with and engages an appraiser from the panel, pays the appraiser for an appraisal report, reviews and edits the appraisal report, and provides the appraisal report to the lender, in exchange for a fee.

**Federal Law Regarding AMCs**

16. In the wake of the financial crisis of 2007-2008, policy makers perceived that inflated appraisals had contributed to a housing "bubble," *i.e.*, an unsustainable run-up in housing prices. One concern was that some appraisers experienced undue pressure from, or had ties to, lenders or other parties with financial interests in mortgage transactions.

17. In response to these concerns, Congress included in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") provisions intended to ensure that appraisers would operate independently, shielded from inappropriate influence exerted by lenders or other interested parties.

Case 3:19-cv-00849-SDD-EWD    Document 1-3    12/09/19    Page 4 of 11
REDACTED PUBLIC VERSION

18. One set of appraisal independence provisions in Dodd-Frank and its implementing rules prohibits contacts between lender personnel and retained appraisers that might influence an appraiser's independent judgment. In part because of these prohibitions, lenders increasingly turned to AMCs to arrange for required appraisal services. Today, lenders engage AMCs to obtain an appraisal in most residential real estate transactions.

19. Also to promote appraisal independence, Dodd-Frank requires lenders and their agents, in covered transactions, to compensate appraisers "at a rate that is customary and reasonable for appraisal services performed in the market area of the property being appraised." Covered transactions are loans that extend consumer credit secured by the consumer's principal dwelling, such as mortgages and home equity loans.

20. Dodd-Frank includes a provision known as an "antitrust savings clause." Dodd-Frank provides that "[n]othing in this Act … shall be construed to modify, impair, or supersede the operation of any of the antitrust laws." In other words, Congress specifically directed that Dodd-Frank was not intended to displace generally applicable antitrust principles, including the prohibition on unreasonable agreements in restraint of trade.

21. Under Dodd-Frank, Congress tasked the Board of Governors of the Federal Reserve System (the "Federal Reserve") with issuing rules on behalf of the Federal Reserve and other federal banking agencies to further specify appraisal independence requirements.

22. In October 2010, the Federal Reserve issued rules implementing Dodd Frank's appraisal independence requirements. In its commentary on the rules, the Federal Reserve interpreted the statutory requirement that lenders pay "customary and reasonable" appraisal fees to mean "that the marketplace should be the primary determiner of the value of appraisal services, and hence the customary and reasonable rate of compensation" for appraisers.

23. The October 2010 rules specify that lenders or their agents presumptively comply with the statutory customary and reasonable appraisal fee requirement in one of two ways ("presumptions of compliance"). A lender or its agent may pay to an appraiser a fee "reasonably related to recent rates paid for comparable appraisal services performed in the geographic market of the property," as informed by six identified factors: (i) the type of property; (ii) the scope of work; (iii) the time in which the appraisal must be performed; (iv) the appraiser's qualifications; (v) the appraiser's experience and professional record; and (vi) the appraiser's work quality. Alternatively, a lender or its agent may pay a fee based on "objective third-party information," including fee schedules, studies, and independent surveys of recent appraisal fees (excluding fees paid by AMCs).

24. In commentary on the October 2010 rules, the Federal Reserve clarified that the two identified presumptions of compliance are not the only permissible ways to comply with the customary and reasonable fee requirement under Dodd-Frank. If a lender or its agent arrives at an appraisal fee in another way, whether the fee is customary and reasonable shall depend on all relevant facts and circumstances, without a presumption of either compliance or violation.

25.     Another provision in Dodd-Frank directs federal banking agencies to establish minimum requirements for states that choose to regulate AMCs. Among other things, these requirements must ensure that "appraisals are conducted independently and free from inappropriate influence and coercion pursuant to the appraisal independence standards" set forth in Dodd-Frank. Congress did not require states to delegate regulation of customary and reasonable fee requirements to active market participants.

26.     In 2015, federal banking agencies jointly issued rules implementing this Dodd-Frank provision. The rules provide that any state that chooses to regulate AMCs must require any AMC that is not regulated by a federal banking agency to "[e]stablish and comply with processes and controls reasonably designed to ensure that the AMC conducts its appraisal management services in accordance with [Dodd Frank's appraisal independence requirements]." The rules also provide that any state that chooses to regulate AMCs must maintain an AMC licensing program within the state appraiser licensing agency with mechanisms to discipline AMCs for violations of appraisal-related laws. The rules do not require states or state appraiser licensing agencies to impose standards for customary and reasonable fee requirements beyond what federal law provides, or to set customary and reasonable fees at any particular level.

**Louisiana Statutes Regarding AMCs**

27.     In 2009, the Louisiana legislature passed a new law subjecting AMCs to oversight by the Board (the "AMC Law"), and requiring any AMC that wishes to operate in Louisiana to obtain a license from the Board. The Board is empowered to investigate, censure, and discipline AMCs that violate the law.

28.     In 2012, the Louisiana legislature amended the AMC Law to require AMCs to "compensate appraisers at a rate that is customary and reasonable for appraisals being performed in the market area of the property being appraised, consistent with the presumptions of compliance under federal law." The AMC Law authorizes the Board to promulgate regulations necessary for enforcement of the AMC Law. The AMC Law does not require the Board to impose standards for customary and reasonable fee requirements beyond what federal law provides, or to set customary and reasonable fees at any particular level.

## THE BOARD'S ACTIONS TO SUPPRESS COMPETITION

29.     The Board suppresses competition among appraisers and displaces market forces. The Board's executive director has stated: [REDACTED]

5

30. In 2013, driven by its apparent dissatisfaction with the free market, the Board adopted a regulation purporting to implement the AMC Law, known as Rule 31101. The regulation, which specifies how AMCs must comply with the customary and reasonable fee requirement, unlawfully restrains competition on its face by prohibiting AMCs from arriving at an appraisal fee through the operation of the free market.

31. Specifically, Rule 31101 requires AMCs to pay fees set pursuant to one of three prescribed methods. First, an AMC may rely on third-party fee schedules, studies, or surveys of fees paid by lenders. Second, an AMC may rely on a fee schedule formally adopted by the Board. Third, an AMC may rely on rates recently paid in the relevant geographic market, adjusted by the six factors identified in the parallel federal rules (set out in paragraph 23 above). Because Rule 31101 identifies these methods as the exclusive ways for arriving at customary and reasonable fees, it precludes AMCs from arriving at appraisal fees through the operation of the free market.

32. In enforcing Rule 31101, the Board has also unlawfully restrained price competition. Although Rule 31101 identifies three methods of compliance, the Board has effectively required payment of appraisal fees at least as high as median fees listed in fee surveys that the Board itself has commissioned.

33. Beginning in 2013, the Board commissioned the SLU Center to survey recent fees paid by lenders to appraisers in Louisiana. The SLU Center surveyed lenders and, ▓▓▓▓▓ ▓▓▓▓▓ appraisers. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

34. ▓▓▓▓▓▓▓▓ appraisers were eager to participate in the survey. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Appraisers responded, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

35. For fees paid in each of 2012, 2013, and 2014, the SLU Center prepared a report identifying median appraisal fees for urban, suburban, and rural areas statewide and in nine geographic regions in Louisiana, for each of five common types of real estate appraisals. For example, the 2014 survey reported that the median statewide fee for the appraisal of an individual condominium unit in a suburban area was $450. Reported median fees combined survey responses from lenders and appraisers. The Board provided AMCs with notice of the SLU Center survey results and posted them on its website.

36. The Board views the SLU Center survey results as setting a floor for appraisal fees that AMCs must pay appraisers. As the Board's executive director reportedly said at an industry conference, the survey "sets out our expectations regardless of what presumption might be used, regardless of what analytics and magic formulas an AMC might have, this is our expectation." AMCs that do not follow the rates set forth in the SLU Center reports risk investigation and discipline by the Board.

6

37. One investigation, against an AMC known as CoesterVMS ("Coester"), began ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ The investigation led to a Board complaint alleging that Coester had violated customary and reasonable fee requirements under Louisiana law. The matter was resolved by a stipulated order under which Coester agreed to "follow the current Louisiana fee schedule," *i.e.*, the median fees set forth in SLU Center reports. Coester also agreed to pay the Board $5,000 in administrative costs.

38. The Board publicized its settlement with Coester. The settlement was closely followed within the industry. Trade press reported that the Board had "made history" with its enforcement against an AMC of the customary and reasonable fee requirement.

39. Another investigation, against an AMC known as iMortgage Services ("iMortgage"), ▬▬▬ began after an appraiser complained that the AMC had offered low fees. The investigation led to a Board complaint alleging that scores of appraisal fees paid by iMortgage failed to meet the customary and reasonable fee requirement under Louisiana law. Over the course of proceedings, the Board dropped allegations about most of these transactions. Among others, the Board dropped all allegations related to appraisal fees that it could not directly measure against SLU Center survey results, and allegations related to fees that were equal to or exceeded median fees reported in the survey. In the end, the Board limited the proceeding to nine appraisal fees that were lower than corresponding median fees set forth in the SLU Center report.

40. After a hearing, the Board entered findings and an order against iMortgage. The Board determined that iMortgage violated the customary and reasonable fee requirement under Louisiana law in each of the nine instances addressed at the hearing. The Board censured iMortgage, fined it $10,000 plus administrative costs, and conditionally suspended iMortgage's license to operate as an AMC. The Board stayed the suspension pending iMortgage's submission of an acceptable plan to comply with the Board's ruling. The Board rejected iMortgage's first proposed compliance plan and accepted iMortgage's compliance plan only when iMortgage agreed to pay fees consistent with the most recent SLU Center report.

41. The Board's proceeding against iMortgage was public and closely followed within the industry. Trade press reported on the Board's ruling that iMortgage had not paid customary and reasonable appraisal fees and on the sanctions that the Board imposed on the AMC.

42. The Board investigated other AMCs in response to appraiser complaints about low fees. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

43. The conduct of the Board constitutes concerted action among the Board and its members.

**EFFECTS ON COMPETITION OF THE BOARD'S ACTIONS**

44.     The Board's actions have unreasonably restrained competition and harmed consumers. The Board's actions tend to restrain significantly appraisal fee negotiations between appraisers and AMCs, and to raise prices paid by AMCs for appraisal services in Louisiana above competitive levels.

45.     As a result of the Board's actions, Louisiana appraisers ▮▮▮▮▮▮▮▮▮▮ In one case, ▮▮▮▮▮▮▮▮▮▮



46.     In another case, ▮▮▮▮▮▮▮▮▮▮

47.     In another case, ▮▮▮▮▮▮▮▮▮▮

48.     As a result of ▮▮▮▮▮▮ the Board's enforcement campaign, AMCs operating in Louisiana have increasingly used median fees reported in SLU Center surveys to set appraisal fees. Several AMCs that have been the target of Board investigations and enforcement actions, including Coester and iMortgage, have explicitly agreed with the Board to use the SLU Center reports to set appraisal fees. Other AMCs have decided to use SLU Center reports to set fees after learning of the Board's enforcement campaign, in an effort to avoid Board scrutiny and sanctions.

49.     The relevant market for purposes of analyzing the Board's conduct consists of real estate appraisal services sold to AMCs in Louisiana. While appraisal fees may vary by region or metropolitan area within Louisiana, the Board possesses and has exercised the power to raise fees paid by AMCs statewide through its regulation of AMCs.

50. The Board possesses and has exercised the power to restrain competition among appraisers in the relevant market. The Board's actions have tended to suppress, and will continue to suppress, price competition among appraisers for the provision of real estate appraisal services to AMCs in Louisiana.

51. Neither Congress nor the Louisiana legislature has required the Board to set customary and reasonable fees at a particular level. Rather, the Board, acting in its discretion, has effectively required AMCs to pay appraisal fees that equal or exceed the median fees identified in SLU Center survey reports.

52. The Louisiana AMC Law does not clearly articulate an intention to displace competition in the setting of appraisal fees.

53. A controlling number of Board members are active market participants. The Board's actions have not been supervised by independent state officials, that is, by persons who are not participants in the Louisiana appraisal industry.

54. Congress did not, through Dodd-Frank or any other statute, require, authorize, or intend that unsupervised active market participants shall regulate appraisal fees. States may comply with Dodd-Frank requirements without violating the antitrust laws.

## VIOLATION OF THE FTC ACT

55. The acts and practices of the Board described above constitute concerted action that unreasonably restrains trade and are unfair methods of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45. Such acts and practices, and the effects thereof, are continuing and will continue or recur in the absence of appropriate and effective relief.

## NOTICE

Notice is hereby given to the Respondent that the thirtieth day of January, 2018, at 10:00 a.m., is hereby fixed as the time, and Federal Trade Commission offices, 600 Pennsylvania Avenue, NW, Washington, DC 20580, as the place when and where a hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in the complaint, at which time and place you will have the right under the Federal Trade Commission Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement

of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material allegations to be true. Such an answer shall constitute a waiver of hearing as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings of fact and conclusions of law under § 3.46 of said Rules.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint, and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after an answer is filed by the Respondent. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Washington, DC 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the prehearing scheduling conference, and Rule 3.31(b) obligates counsel for each party, within five days of receiving the Respondent's answer, to make certain initial disclosures without awaiting a formal discovery request.

**NOTICE OF CONTEMPLATED RELIEF**

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Board has violated or is violating Section 5 of the Federal Trade Commission Act, as alleged in the complaint, the Commission may order such relief as is supported by the record and is necessary and appropriate, including, but not limited to:

1. Requiring the Board to rescind and to cease and desist from enforcing Rule 31101, any order based on an alleged violation of Rule 31101, and any agreement with an AMC or other person resolving an alleged violation of Rule 31101.

2. Requiring the Board to cease and desist from raising, fixing, maintaining, or stabilizing prices or price levels, rates or rate levels, or engaging in any other pricing action in connection with the sale of real estate appraisal services.

3. Requiring the Board to cease and desist from adopting, promulgating, or enforcing any regulation, rule, or policy relating to the determination of compensation levels for real estate appraisal services.

    4.    Requiring the Board to provide appropriate notice of the Commission's order, including by:

        a. placing a prominent notice on the Board's website stating that the Board has been ordered to rescind and cease and desist from enforcing Rule 31101, together with a link to the Commission's order;

        b. sending by mail or email to each AMC licensed in Louisiana a copy of the notice placed on the Board's website, together with a link to the Commission's order; and

        c. distributing a copy of the Commission's order to every current and future Board member; and every officer, manager, representative, agent and employee of the Board.

    5.    Such additional relief as is necessary to correct or remedy, or prevent the recurrence of, the anticompetitive acts alleged in the complaint.

**WHEREFORE, THE PREMISES CONSIDERED,** the Federal Trade Commission on this thirtieth day of May, 2017, issues its complaint against the Board.

By the Commission.

                              Donald S. Clark
                              Secretary

SEAL: