# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

iMORTGAGE SERVICES, LLC

VERSUS

LOUISIANA REAL ESTATE APPRAISERS BOARD,
ROLAND M. HALL, GAYLE A. BOUDOUSQUIE,
CHERYL B. BELLA, NEWTON J. LANDRY,
TOMMIE E. MCMORRIS, SR., MICHAEL A. GRAHAM,
CLAYTON F. LIPSCOMB, and TIMOTHY W. HAMMETT

CIVIL ACTION

19-849-SDD-EWD

## RULING

Before the Court is the *Motion to Dismiss*[1] filed by Defendants Louisiana Real Estate Appraisers Board ("LREAB" or "the Board") and Roland M. Hall, Gayle A. Boudousquie, Cheryl B. Bella, Newton J. Landry, Tommie E. McMorris, Sr., Michael A. Graham, Clayton F. Lipscomb, and Timothy W. Hammett, in their official capacities as members of the LREAB ("the Members") (the Board and the Members are collectively referred to as "Defendants"). An *Opposition*[2] was filed by Plaintiff iMortgage Services, LLC ("iMortgage"), to which Defendants filed a *Reply*.[3] For the following reasons, the *Motion* is granted, and Plaintiff's claims are dismissed with prejudice.

### I.     BACKGROUND

iMortgage brings this action for alleged violations of federal antitrust law by the Board. iMortgage is an appraisal management company that acts as an intermediary between residential appraisers and parties such as lenders, borrowers, and brokers.[4] The

---

[1] Rec. Doc. 45.
[2] Rec. Doc. 51.
[3] Rec. Doc. 54.
[4] Rec. Doc. 1, ¶ 25.

Board is a state entity tasked with the licensing and regulation of real estate appraisers in Louisiana.[5] It has ten members who are appointed by the governor and confirmed by the senate.[6] Those members are generally licensed real estate appraisers and active participants in the Louisiana real estate appraisal market.[7]

In 2013, the Board promulgated Rule 31101.[8] The rule required Appraisal Management Companies (such as iMortgage) to pay appraisal fees equal to or greater than median market fees.[9] According to iMortgage, Rule 31101 "manufacture[d] an artificial rate floor" that "harmed competition and directly benefitted the majority of the members of LREAB to the detriment of Louisiana residents and [Appraisal Management Companies]."[10]

The FTC shared this sentiment. In May 2017 the FTC instituted a civil administrative action against the Board, alleging that Rule 31101 unreasonably restrained price competition for appraisal services in Louisiana.[11] In its adjudicatory capacity, the FTC held that "state action" immunity did not apply to the Board because it was composed of active market participants who operated beyond sufficient state supervision.[12]

In 2019, iMortgage filed the instant suit, seeking injunctive and monetary relief against the Board. Specifically, iMortgage requested (1) a declaration that Rule 31101 is unenforceable and invalid under federal antitrust laws, (2) injunctive relief against the Board and its members to prohibit any further application of the rule, and (3) monetary

---

[5] La. Rev. Stat. § 37:3395(A)(1).
[6] *Id.* §§ 37:3394(B), (C).
[7] *Id.*
[8] La. Admin. Code tit. 46, pt. LXVII, § 31101 (2013). In 2017, the Board repealed and readopted Rule 31101 with precisely the same language. *See* La. Admin. Code tit. 46, pt. LXVII, §31101 (2017).
[9] *Id.*
[10] Rec. Doc. 51, p. 8.
[11] Rec. Doc. 1-3.
[12] *In re. La. Real Est. Appraisers Bd., Respondent*, 2018 WL 1836646, at *21 (F.T.C. Apr. 10, 2018).

damages.[13] Upon a *Joint Motion*,[14] the Court stayed proceedings pending resolution of the FTC action.[15]

In June 2021, the Board entered into a consent agreement with the FTC.[16] Pursuant to the agreement, the FTC issued an order (the "Consent Decree") preventing the Board from "adopting, promulgating, or enforcing any regulation or rule that sets, determines, or fixes compensation . . . including enforcing Rule 31101."[17] The Consent Decree requires the Board to submit compliance reports to the FTC and grants the FTC the right to access records under the control of the Board.[18] The Consent Decree is set to terminate on April 1, 2042.[19]

In May 2022, the Court lifted the stay and re-opened this action.[20] Defendants now seek dismissal of all claims for lack of subject matter jurisdiction.

## II.    LAW

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject matter jurisdiction of the district court to hear a case. The party asserting that the court has jurisdiction bears the burden of proving that the court may adjudicate the case.[21] In determining whether it has subject matter jurisdiction, the court may look at the complaint alone, the complaint supplemented by undisputed facts in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed

---

[13] Rec. Doc. 36.
[14] Rec. Doc. 29.
[15] Rec. Doc. 30.
[16] *In re. La. Real Est. Appraisers Bd., a state agency*, No. 9374, 2021 WL 2589273 (F.T.C. June 11, 2021).
[17] *In re. La. Real Est. Appraisers Bd., a state agency*, No. 9374, 2022 WL 1102051, at *2 (F.T.C. Apr. 1, 2022).
[18] *Id.* at *3-4.
[19] *Id.* at *4.
[20] Rec. Doc. 35.
[21] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

facts.[22] A 12(b)(1) motion should be granted only if it appears certain that the party asserting jurisdiction can prove no set of facts that would entitle him to relief.[23]

## III. ANALYSIS

Defendants dispute subject matter jurisdiction as to each claim. Defendants argue that iMortgage's claims for declaratory and injunctive relief are mooted by the repeal of Rule 31101 pursuant to the Consent Decree. Defendants further assert that iMortgage's claim for monetary relief is barred by the Eleventh Amendment. The Court addresses these arguments in turn.

### A. Claims for Declaratory and Injunctive Relief

Defendants argue that iMortgage's claims for declaratory and injunctive relief are moot. Specifically, Defendants argue that it would be "redundant for this Court to enjoin Defendants from fixing prices when the FTC Order prohibits the same conduct."[24] iMortgage responds that the FTC order provides insufficient or incomplete relief and cannot guarantee that Defendants will refrain from passing Rule 31101 or a similar rule in the future.

"Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'"[25] "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents."[26] Generally, "any set of circumstances that eliminates actual controversy after the commencement of

---

[22] *Id.*
[23] *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998); *see also Ramming*, 281 F.3d at 161.
[24] Rec. Doc. 45-1, p. 6.
[25] *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 661 (5th Cir.2006) (quoting *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).
[26] *Env't Conservation Org. v. City of Dallas* (*ECO)*, 529 F.3d 519, 525 (5th Cir. 2008).

a lawsuit renders that action moot."[27] "A case should not be declared moot [a]s long as the parties maintain a concrete interest in the outcome and effective relief is available to remedy the effect of the violation . . . ."[28]

iMortgage advances the general rule that a "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of practice."[29] Under the voluntary cessation doctrine, the party asserting mootness bears the burden of showing that "there is no reasonable expectation that the wrong will be repeated."[30] iMortgage contends that there is a "demonstrated probability that iMortgage will be subject to the same unlawful acts of the Defendants again."[31]

Neither the Supreme Court nor the Fifth Circuit has directly addressed whether the voluntary cessation doctrine applies to cessation of activity pursuant to an FTC consent decree. However, in *Already v. Nike*, the Supreme Court held that the voluntary cessation doctrine remains in force even "when a defendant makes a judicially enforceable commitment to avoid the conduct that forms the basis for an Article III controversy."[32] There, Nike entered into a covenant not to sue Already for trademark infringement. Nike argued that the voluntary cessation rule did not apply because Nike lacked an "unfettered ability to 'return to [its] old ways.'"[33] The Supreme Court rejected this argument, holding that a defendant "cannot avoid its 'formidable burden' by assuming the answer to" the question that the voluntary cessation test poses—namely, whether the "allegedly wrongful

---

[27] *Id.* at 527 (quoting *Carmouche*, 449 F.3d at 661).
[28] *Id.* (citation omitted) (cleaned up).
[29] *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).
[30] *Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) (quoting *ACLU v. Finch,* 638 F.2d 1336, 1346 (5th Cir.1981)).
[31] Rec. Doc. 51, pp. 13-14.
[32] *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013) (citation omitted).
[33] *Id.*

behavior reasonably [could] be expected to recur."[34]

A straightforward application of *Already* suggests that an FTC consent decree—a judicially enforceable agreement—does not circumvent the voluntary cessation doctrine. Indeed, relying on *Already*, at least one district court has come to the same conclusion, stating: "Because a consent decree is by its very nature voluntary, the voluntary cessation exception to mootness applies even though a consent decree, like a covenant not to sue, is 'judicially enforceable.'"[35]

This case is distinguishable from *Environmental Conservation Organization v. City of Dallas* (*ECO*), 529 F.3d 519 (5th Cir. 2008). There, the Fifth Circuit declined to apply the voluntary cessation doctrine when determining whether a citizen suit under the Clean Water Act ("CWA") was mooted by subsequent enforcement action and a court-approved consent decree.[36] Instead, the Fifth Circuit shifted the burden to the plaintiff to demonstrate a "realistic prospect that the violations alleged in its complaint will continue notwithstanding the consent decree."[37]

Thus far, however, the Fifth Circuit has not applied *ECO*'s burden-shifting framework outside the context of citizen suits under federal environmental protection laws. Citizen suits are creatures of statute, and *ECO* expressly derives its less-stringent mootness standard from statutory interpretations and policy considerations unique to citizen suits and environmental protection laws.[38] In *ECO*, the Fifth Circuit stated that "[p]lacing the burden on the citizen-suit plaintiff" is "in step with Congressional policy"[39]

---

[34] *Id.*
[35] *In re Vizio, Inc., Consumer Privacy Litig.*, 2017 WL 11420284, at *4 (C.D. Cal. Jul. 25, 2017) (quoting *Already*, 568 U.S. at 92).
[36] *ECO,* 529 F.3d at 528–529.
[37] *Id.* at 528.
[38] *Id.*
[39] *Id.* at 529.

and "respects Congress's intent that citizen suits 'supplement rather than . . . supplant government action.'"[40] The Fifth Circuit reasoned that its relaxed mootness standard comports with the CWA's mandate that citizen suits be preempted by diligent government prosecutions.[41]

This "clear" congressional policy and intent does not translate to federal antitrust laws. The Clayton Act provides in separate sections for suits for injunctions by the United States[42] and by private parties.[43] In contrast to the CWA, the Act does not contain a "diligent prosecution" provision. As the Supreme Court has explained, the Act's "private and public actions were designed to be cumulative, not mutually exclusive."[44] "Different policy considerations govern each of these," and "[t]hey may proceed simultaneously or in disregard of each other."[45] This stands in stark contrast to citizen suits in the environmental context which, according to the Senate Report on the CWA, are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility."[46] In sum, the Court concludes that *ECO*'s less-stringent mootness standard does not apply here. The voluntary cessation doctrine applies in this case.

Now the Court must answer the question that the voluntary cessation test poses—namely, whether the "allegedly wrongful behavior reasonably [could] be expected to recur."[47] The Court finds that the threat of future enforcement action by the FTC, including civil penalties and associated legal costs, precludes a reasonable expectation that the

---

[40] *Id.* at 528 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60 (1987)).
[41] *Id.* (citing 33 U.S.C. § 1365(b)(1)(B)).
[42] 15 U.S.C.A. § 25.
[43] 15 U.S.C.A. § 26.
[44] *United States v. Borden Co.*, 347 U.S. 514, 518 (1954).
[45] *Id.* at 519 (quoting *United States v. Bendix Home Appliances,* 10 F.R.D. 73, 77 (S.D.N.Y. 1949)).
[46] S. Rep. No. 92-414, at 64 (1971), *reprinted in* 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973).
[47] *Already*, 568 U.S. at 92.

wrong will be repeated. The Consent Decree is comprehensive and forward-looking in scope, requiring the Board to submit compliance reports to the FTC and granting the FTC the right to access records under the control of the Board.[48] The Court cannot reasonably expect that the Board will attempt to reenact Rule 31101, or would be successful in doing so, given that the FTC has demonstrated the will and means to swiftly respond to such violations.

iMortgage points out that the Consent Decree is set to expire in 2042, "after which LREAB could potentially restart the anticompetitive activity that gave rise to this action."[49] But that is almost 20 years from now, at which point, the Board will be composed of entirely new members.[50] The mere possibility that those future members will re-enact Rule 31101 is too speculative to keep the controversy live, even under the voluntary cessation doctrine. Moreover, mootness is "the doctrine of standing in a time frame," and Article III standing is contingent upon an "invasion of a legally protected interest which is . . . actual or imminent."[51] Even assuming that one could predict the actions of the Board two decades into the future, the alleged threat of enforcement is too remote to be actual or imminent. The Court will not issue speculative and advisory relief.

iMortgage makes three further arguments against mootness. First, iMortgage contends that the Consent Decree provides inadequate relief because it contains "potentially conflicting provisions."[52] As discussed above, the Consent Decree prevents the Board from directly or indirectly "[a]dopting, promulgating, or enforcing any regulation

---

[48] *In re. La. Real Est. Appraisers Bd., a state agency*, 2022 WL 1102051, at *3-4.
[49] Rec. Doc. 51, p. 11.
[50] *See* La. Rev. Stat. § 37:3394(D) (stating that "[a]ll members shall be appointed for three-year terms" and [n]o person shall be appointed for more than two consecutive terms").
[51] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).
[52] Rec. Doc. 51, p. 16.

or rule that sets, determines, or fixes compensation or compensation levels for Real Estate Appraisal Services."[53] iMortgage argues that this instruction conflicts with another provision requiring the Board to notify the FTC within 60 days of implementing a "new rule or an amendment to an existing rule relating to compensation or compensation levels for Real Estate Appraisal Services."[54]

The Court disagrees. The notice provision complements the underlying ban on fixing rates, enabling the FTC to swiftly respond to any violative conduct that the Board commits. Further, the two provisions are not coextensive. The notice provision broadly applies to any rule "relating to compensation" and, thus, could apply to rules that do not necessarily fix or determine compensation rates (e.g., a rule commissioning an annual study of compensation levels).[55] In short, there is nothing equivocal about the Consent Decree.

Second, iMortgage argues that the Consent Decree does not go far enough because "Defendants retain their full arsenal of weapons to harm the Louisiana residential appraisal market and AMCs."[56] In its *Complaint*, iMortgage seeks injunctive relief "prohibiting the Board and the individual defendants from entering into, attempting to enter into, adhering to, participating in, maintaining, organizing, implementing, encouraging, inviting, enforcing, offering or soliciting any agreement whether express or implied, to insulate themselves from competition from AMCs in the relevant market."[57]

This additional relief is fatally overbroad. "[T]he scope of injunctive relief is dictated

---

[53] *In re. La. Real Est. Appraisers Bd., a state agency*, 2022 WL 1102051, at *2.
[54] *Id.* at *3.
[55] See id.
[56] Rec. Doc. 51, p. 15.
[57] Rec. Doc. 1, p. 29.

by the extent of the violation established, and an injunction must be narrowly tailored to remedy the specific action necessitating the injunction."[58] Federal Rule of Civil Procedure 65(d) requires specificity in framing injunctions "so that those enjoined will know what conduct the court has prohibited."[59] Here, the action necessitating the injunction—the Board's enforcement of Rule 31101—has been enjoined by the Consent Decree. The Consent Decree prohibits Defendants from "[r]aising, fixing, maintaining, or stabilizing price levels" or passing a rule that "sets, determines, or fixes compensation" for appraisal services.[60] This prohibition clearly covers iMortgage's request, per its *Complaint,* to enjoin "all efforts by Defendants to force [participants] in the relevant market . . . to pay appraisal fees that are fixed. . . ."[61] iMortgage does not plead injunction of any other specific Board action or rule. iMortgage hypothesizes that the Board could promote future anticompetitive acts such as, say, a rule requiring specific forms that would cause Appraisal Management Companies to incur additional costs. This is mere speculation. There is no suggestion on the face of the *Complaint* that the Board has enacted, proposed, or even contemplated such a rule.

Last, iMortgage contends that, even if its suit is otherwise moot, it falls into a long-recognized exception to the mootness doctrine for issues "capable of repetition, yet evading review. . . ."[62] To invoke that exception, a party must show that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to

---

[58] *Fiber Sys. Int'l., Inc. v. Roehrs,* 470 F.3d 1150, 1159 (5th Cir. 2006) (internal quotations omitted).
[59] *Meyer v. Brown & Root Constr. Co.,* 661 F.2d 369, 373 (5th Cir.1981).
[60] *In re. of La. Real Est. Appraisers Bd., a state agency*, 2022 WL 1102051, at *2.
[61] Rec. Doc. 1, p. 29.
[62] *S. Pac. Terminal Co. v. Interstate Com. Comm'n,* 219 U.S. 498, 515 (1911).

the same action again."[63] Neither of those elements are present here. First, the challenged conduct is not too short to evade review—indeed, the Board's violative conduct has already been reviewed by the FTC and prohibited by the Consent Decree. Second, for the reasons discussed above, the relevant facts bely a reasonable expectation that the challenged conduct will be repeated. Accordingly, iMortgage's claims for declarative and injunctive relief are moot and shall be dismissed.

### B. Claim for Damages

Plaintiff further seeks monetary damages "sustained as a result of the anticompetitive actions by Defendants."[64] Defendants acknowledge that dismissal of Plaintiff's claims for declaratory and injunctive relief does not moot Plaintiff's claim for damages for past harm.[65] Nevertheless, Defendants argue that Plaintiff's damages claim is barred by the Eleventh Amendment, which prohibits private citizens from seeking damages against the state in federal court.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[66] "The 'ultimate guarantee of the Eleventh Amendment' . . . is that a non-consenting State may not be sued in federal court by private individuals, including its own citizens."[67] Although Louisiana has broadly consented to suit in its own courts through article XII, section 10, of the Louisiana Constitution, and Louisiana Revised Statutes §

---

[63] *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 462 (2007).
[64] Rec. Doc. 1, p. 29.
[65] Rec. Doc. 45-1, p. 11 (citing *Spell v. Edwards*, 962 F.3d 175, 180 (5th Cir. 2020)).
[66] U.S. Const. amend. XI.
[67] *Vogt v. Bd. of Com'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002) (quoting *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001)).

9:2798.1, those provisions do not contain an express consent to suit in federal court and, thus, do not constitute a waiver of Eleventh Amendment immunity.[68]

The State's immunity under the Eleventh Amendment extends to any state agency or other political entity that is deemed an "alter ego" or "arm" of the State.[69] There is no bright-line test for determining whether a political entity is an arm of the State.[70] Rather, "the matter is determined by reasoned judgment about whether the lawsuit is one which, despite the presence of a state agency as the nominal defendant, is effectively against the sovereign state."[71] In making this inquiry, Fifth Circuit courts consider six factors: (1) whether state statutes and case law characterize the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.[72] "[T]he most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds."[73]

1. Characterization

The first factor examines how the state, through its constitution, laws, judicial opinions, attorney general's opinions, and other official statements, perceives the entity in question.[74] If the state characterizes the office in question as an arm of the state, this

---

[68] *Fairley v. Stalder.* 294 F. App'x 805, 811 (5th Cir. 2008).
[69] *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 (1997).
[70] *Vogt*, 294 F.3d at 689.
[71] *Id.* (quoting *Earles v. State Bd. of Certified Pub. Accts. of La.,* 139 F.3d 1033, 1037 (5th Cir.1998)).
[72] *Id.*
[73] *Id.* (quoting *Delahoussaye v. City of New Iberia,* 937 F.2d 144, 147–48 (5th Cir.1991)).
[74] *Hudson v. City of New Orleans*, 174 F.3d 677, 683 (5th Cir. 1999).

factor is counted in favor of Eleventh Amendment immunity.[75]

Here, the Board is undeniably a state entity within the executive branch. Louisiana Revised Statutes § 37:3394 provides for the creation of the Board "within the office of the governor." The Board's members are appointed by the governor and confirmed by the Senate.[76] Thus, it appears that Louisiana would regard the Board as "an arm of the state" for Eleventh Amendment purposes. Indeed, Fifth Circuit caselaw compels this conclusion. On multiple occasions, the Fifth Circuit has found a Louisiana executive department or one of its subdivisions to be characterized as an arm of the state.[77] Accordingly, the first factor supports Eleventh Amendment immunity.

2. Source of Funding

Turning to the second factor, the Court examines whether a judgment against the Board will be paid with state funds. This factor is given the greatest weight because one of the principal purposes of the Eleventh Amendment is to protect state treasuries.[78]

Here, any judgment against the Board would be paid by the State. The Louisiana Constitution provides, "[n]o judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered."[79] The Fifth Circuit has recognized that "judgments against [Louisiana] state agencies or departments within the executive branch are treated as liabilities of the state itself."[80]

---

[75] *Id.*
[76] La. Rev. Stat. § 37:3394.
[77] *See, e.g., Earles v. State Bd. of Certified Pub. Accts. of La.*, 139 F.3d 1033, 1037 (5th Cir. 1998) (State Board of Certified Public Accountants); *Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 186 (5th Cir.1986) (Louisiana Wildlife and Fisheries Commission); *Darlak v. Bobear,* 814 F.2d 1055, 1060 (5th Cir.1987) (Department of Health and Human Services).
[78] *Cozzo v. Tangipahoa Par. Council—President Gov't,* 279 F.3d 273, 281 (5th Cir. 2002).
[79] La. Const. art. 12, § 10(C).
[80] *Vogt,* 294 F.3d at 693.

There is no doubt that the Board qualifies as a state agency in this regard.[81] Thus, the Board is entitled to indemnity by state funds. The second factor supports Eleventh Amendment immunity.

3. Local Autonomy

The third factor assesses the Board's degree of local autonomy and control. The Court should consider the "extent of the [entity's] independent management authority" as well as "the independence of the individual commissioners" who govern the entity.[82]

Here, the Board consists of ten members who are appointed by the Governor and confirmed by the Senate.[83] However, the Governor can only remove Board members "for cause."[84] This differs from other state regulatory boards, such as the State Board of Certified Public Accountants, whose members serve at the pleasure of the governor.[85] The fact that the Board's members are shielded from the governor's pleasure pulls toward a finding of local autonomy.[86]

As with all state agencies, Louisiana law provides for legislative review of regulations proposed by the Board.[87] However, the Board's proposed rule changes may simply take effect without any legislative consideration or action whatsoever,[88] as was the case with Rule 31101.[89] Moreover, no state branch of government has supervisory control

---

[81] La. Rev. Stat. § 13:5102(A) (defining "state agency" as "any *board*, commission, department, agency, special district, authority, or other entity of the state") (emphasis added).
[82] *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,* 762 F.2d 435, 442 (5th Cir.1985), *cert. denied,* 474 U.S. 1057 (1986).
[83] La. Rev. Stat. §§ 37:3394(B), (C).
[84] *Id.* § 37:3394(D).
[85] *Id.* § 37:74(C).
[86] *See Vogt*, 294 F.3d at 695.
[87] *See* La. Rev. Stat. § 49:968.
[88] *See id.* § 49:968(H)(1) (if the legislature fails to act on proposed rule changes, the rule may be adopted ninety days after notice is published in the State Register).
[89] *In re. La. Real Est. Appraisers Bd., Respondent*, 2018 WL 1836646, at *12.

over the Board's day-to-day operations,[90] and the Board's rulings revoking or suspending licenses of real estate appraisers are not subject to review by either the executive or legislative branch.[91] Accordingly, this factor does not support Eleventh Amendment immunity.

### 4. Local Versus Statewide Problems

The fourth factor asks whether the Board is concerned with local or statewide problems.[92] Generally, territorial limits on an agency's authority suggest that the agency is not an arm of the State.[93] Here, the Board is charged with regulating the issuance of real estate appraisal and trainee licenses throughout the State of Louisiana, without regard for geographic or territorial boundaries.[94] This factor weighs in favor of Eleventh Amendment immunity.

### 5. Authority to Sue

The fifth factor examines whether the Board has the capacity to sue and be sued.[95] Here, unlike other licensing boards in Louisiana, the LREAB has not expressly been granted the capacity to sue and be sued.[96] It remains unclear if the Board has such a capability. Accordingly, this factor has little effect on the Court's analysis.

### 6. Right to Hold Property

---

[90] *Vogt*, 294 F.3d at 694-95 (finding that the Orleans Levee District possessed a "considerable degree of local autonomy" as "no branch of state government exercises 'supervisory control' over the day-to-day operations of the levee district").
[91] *See* La. Rev. Stat. § 37:3409(C)(3) ("Any final decision or determination of the board in adjudicatory proceedings shall be reviewable as to questions of law by the Nineteenth Judicial District Court in the parish of East Baton Rouge.").
[92] *Hudson*, 174 F.3d at 690.
[93] *Vogt*, 294 F.3d at 695.
[94] *See id.*
[95] *Hudson*, 174 F.3d at 691.
[96] *See, e.g.*, La. Rev. Stat. § 37:1361 (State Plumbing Board "may sue and be sued"); *Id.* § 37:2161 (Louisiana State Board of Private Investigator Examiners "may sue and be sued"); *Id.* § 37:2153 (State Licensing Board for Contractors "may sue and be sued").

The sixth factor asks whether the Board has the right to hold and use property. Although there is no express statutory grant of such power to the Board, the powers of the Board arguably encompass the right to hold and use property. The Board is financially independent from the State—its funds come from fees levied against real estate appraisers, which "shall be paid into the operating account of the board for the purpose of carrying out" its duties.[97] The Court finds that this factor weighs against Eleventh Amendment immunity.

In sum, three factors firmly support Eleventh Amendment immunity, two do not, and one is neutral. The factors tip in favor of the Board—though the question is closer than the numbers suggest. It must be noted that the Board exercises a striking amount of autonomy for an entity that is staffed with active participants in the market it regulates, and this autonomy well exceeds that of similarly situated boards and entities.[98] Ultimately, however, this consideration is outweighed by the State's fiscal liability for the Board's actions—the most important factor—as well as the Board's broad authority to regulate the real estate appraisal market on a statewide basis. The Court therefore concludes that the Board is "an arm of the state" for purposes of Eleventh Amendment immunity.

This finding does not contradict the FTC's previous finding that the Board lacks *Parker* immunity.[99] *Parker* immunity (or state action immunity) is the doctrine that federal antitrust law does not apply to the anticompetitive conduct of States acting in their sovereign capacity.[100] "In the context of antitrust suits, courts have recognized that both

---

[97] La. Rev. Stat. § 37:3407(C).
[98] *Compare* La. Rev. Stat. § 37:3394(D) (stating that members of the Louisiana Real Estate Appraisers Board may be removed for cause) *with* La. Rev. Stat. § 37:74(C) (stating that members of the State Board of Certified Public Accountants serve at the pleasure of the governor).
[99] *See In re. La. Real Est. Appraisers Bd., Respondent*, 2018 WL 1836646 (denying motion to dismiss antitrust claim as moot; active state control had not been shown).
[100] *Parker v. Brown,* 317 U.S. 341, 350-52 (1943).

*Parker* immunity and sovereign immunity are potential defenses for state entities."[101] Although related, "sovereign immunity and *Parker* immunity are distinct doctrines, providing different—if sometimes overlapping—spheres of protection from private federal antitrust claims."[102]

Declining the Board's plea of *Parker* immunity, the FTC applied the Supreme Court's decision in *North Carolina State Board of Dental Examiners v. F.T.C.*[103] There, the Supreme Court held that a state regulatory board with a majority of members who engaged in the active practice of the profession it regulated was not protected by *Parker* immunity because it was not actively supervised by the state.[104] Importantly, however, the Supreme Court clarified that *Parker* immunity and Eleventh Amendment immunity are not coterminous, stating, "members of regulated occupations" who "participat[ed] in state government" could sometimes look beyond *Parker* immunity to sovereign immunity as a defense.[105]

In short, the question before the Court is not whether the Board's actions are immune from federal antitrust law but, rather, whether the Board "is so closely connected to the State" that a suit against the Board is effectively against the sovereign state.[106] Although the FTC held that a lack of active state supervision deprived the Board of *Parker* immunity, such a consideration is only one factor among six for purposes of Eleventh Amendment immunity.[107] Because the Board is characterized as a state agency, is indemnified with state funds, and is invested with statewide authority, the Board is "an

---

[101] *Rodgers v. Louisiana Bd. of Nursing*, 665 F. App'x 326, 329 (5th Cir. 2016).
[102] *Id.*
[103] 574 U.S. 494 (2015).
[104] *Id.* at 511.#
[105] *See id.* at 513.
[106] *See Vogt*, 294 F.3d at 689.
[107] *See id.*

arm of the state" for Eleventh Amendment purposes and, thus, enjoys immunity from iMortgage's claims for damages.

Finally, iMortgage contends that even if the Board is entitled to Eleventh Amendment immunity, the Board waived its immunity by invoking federal jurisdiction in previous suits.[108] However, federal courts recognize that waiver in one suit does not extend to an "entirely separate lawsuit, even one involving the same subject matter and same parties."[109] Because the Board has taken no action to avail itself of federal court jurisdiction in this particular suit, the Board has not waived its Eleventh Amendment immunity.

---

[108] Specifically, iMortgage contends that the Board waived its Eleventh Amendment immunity by (1) appealing an FTC decision to the Fifth Circuit and/or (2) filing an action against the FTC in this Court under the Administrative Procedure Act. Rec. Doc. 51, p. 25.
[109] *A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1219 (Fed. Cir. 2010).

## IV.     CONCLUSION

For the reasons set forth above, Defendants' *Motion to Dismiss*[110] is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, this day, February 27, 2023.

*Shelly D. Dick*

**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[110] Rec. Doc. 45.